Filed: 2/26/15  City of Palmdale v. All Persons Interested etc. Parking Dev. Agreement CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CITY OF PALMDALE,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>ALL PERSONS INTERESTED IN THE MATTER OF THE VALIDITY OF THE PARKING DEVELOPMENT AGREEMENT, ETC. et al.,<br><br>　　Defendants and Respondents. | B244134<br><br>(Los Angeles County<br>Super. Ct. No. BC481923 ) |

　　　　APPEAL from orders of the Superior Court of Los Angeles County, Daniel J. Buckley, Judge.  Affirmed.

　　　　Kane, Ballmer & Berkman, Murray O. Kane and Guillermo A. Frias for Plaintiff and Appellant.

　　　　Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Mark R. Beckington and Susan K. Smith, Deputy Attorneys General, for Defendants and Respondents California Department of Finance and State Controller.

　　　　Greenberg Traurig, Scott D. Bertzyk, Karin L. Bohmholdt, Jeremy A. Meier and Monica J. Baumann for Defendant and Respondent, Wendy Watanabe, County Auditor-Controller.

# I. INTRODUCTION

Plaintiff, City of Palmdale, appeals from a dismissal order entered after two demurrers were sustained without leave to amend to its validation complaint. This case involves two issues arising out of the dissolution of a redevelopment agency. The first issue involves the order sustaining the demurrers without leave to amend brought by defendants: the California Department of Finance (finance department); the State Controller (controller); and Wendy Wantanabe in her capacity as the Auditor-Controller of Los Angeles County (the auditor-controller). The demurrers were accompanied by extensive judicial notice materials. Those materials reveal that the gravamen of the parties' dispute arises out defendants' refusal to approve tax increment funding for a parking structure. The demurrers were sustained to the complaint without leave to amend and the case was dismissed. Second, the finance department and the controller filed a venue change motion based upon Health and Safety Code[1] section 34168, subdivision (a). The venue change motion sought to have the action transferred to Sacramento County Superior Court. The venue change motion was denied.

As to the merits of the demurrers, we conclude they were properly sustained without leave to amend. As to the venue change issue, part 1.85 of division 24 of the Health and Safety Code (part 1.85) encompasses sections 34170 through 34191.5 Section 34168, subdivision (a) requires any "challeng[e to] acts taken pursuant to" part 1.85, sections 34170 through 34191.5, must filed in Sacramento County Superior Court. We conclude the venue change motion should have been granted and the case transferred to Sacramento County Superior Court before the demurrers were ruled upon. However, we conclude the failure to transfer the case was harmless error. Thus, we affirm the demurrer dismissal in its entirety.

---

[1]     Future statutory references are to the Health and Safety Code except where otherwise noted.

2

## II. THE VALIDATION COMPLAINT'S ALLEGATIONS

The validation complaint was filed on April 2, 2012. The validation complaint seeks an order validating a parking structure construction agreement entered into on January 31, 2012. (Code Civ. Proc., § 860; Gov. Code, § 53511, subd. (a).) The parking agreement was entered into between plaintiff and a developer, Community Development Associates. The parking structure development agreement permits construction of a parking structure at a total estimated cost of $6 million.

The following are the facts plaintiff alleges warrant a judgment validating the January 31, 2012 parking development agreement. In 1975, plaintiff formed the Community Redevelopment Agency of the City of Palmdale (the Palmdale redevelopment agency). Between 1975 and 1983, plaintiff created four redevelopment project areas. By 2011, with consolidation of the other areas, two redevelopment project areas remained. On December 2, 2009, the Palmdale redevelopment agency adopted a five-year implementation plan for the two project areas which was later amended. The goals of the implementation plan and its amended versions were: construction of affordable housing; economic development; and commercial, institutional and community revitalization. Prior to January 31, 2012, the Palmdale redevelopment agency received tax increment funds generated from the redevelopment areas. The tax increment funds were used to finance redevelopment activities.

On January 14, 2011, plaintiff and the Palmdale redevelopment agency entered into a cooperation agreement entitled the, "Cooperation Agreement for Payment of Costs Associated With Certain Redevelopment Agency Funded Projects." The purpose of the agreement was to permit the Palmdale redevelopment agency to comply with its bond covenants to carry out redevelopment projects. The cooperation agreement was entered into pursuant to section 33220. The cooperation agreement commits plaintiff, upon receipt of specified funds from the redevelopment agency, to perform certain redevelopment obligations. The complaint refers to plaintiff's new duties as city

3

obligations. To finance the new city obligations created by the January 14, 2011 cooperation agreement, the Palmdale redevelopment agency pledged available tax increment funds to plaintiff. The Palmdale redevelopment agency's financial obligations to plaintiff were subordinated to the rights of holders of existing bonds, notes or other instruments of indebtedness.

The cooperation agreement was later twice amended. The first amended cooperation agreement, dated February 28, 2011: added additional projects to the city projects list; updated the schedule of performance; and updated the schedule of payments by the Palmdale redevelopment agency to plaintiff. On June 1, 2011, the Palmdale redevelopment agency and plaintiff entered into a second amendment to the cooperation agreement. The second amendment to the cooperation agreement removed two projects providing for construction of apartments and townhomes from the list of so-called city projects. The second amendment also made changes to the performance and payment schedules as result of the removal of the apartments and townhomes construction from the list of city projects. The three cooperation agreements included a "Statement of Indebtedness" which, according to the complaint, was filed with the county-auditor, Ms. Wantanabe. No county official objected to the cooperation agreements as indebtedness of the Palmdale redevelopment agency.

Meanwhile, on February 28, 2011, in conjunction with the execution of the first amended cooperation agreement, plaintiff and the Palmdale redevelopment agency entered into an option agreement. On March 10, 2011, plaintiff exercised its rights under the option agreement and purchased the properties. Concurrently therewith, plaintiff and the Palmdale redevelopment agency entered into 11 purchase agreements. All of the properties are to be used for the development of the city projects referred to in the immediately preceding paragraph.

Also on February 28, 2011, plaintiff and the Palmdale redevelopment agency entered into two pledge agreements which are numbered A-3461 and A-3452. Under the terms of pledge agreement No. A-3461, the Palmdale redevelopment agency pledged to plaintiff: evidences of indebtedness; promissory notes; trust deeds; leases and rents

4

assignments; security agreements; and other financial instruments. These documents served as collateral for the Palmdale redevelopment agency's obligations under the cooperation, option and purchase agreements. Further, on the same date, plaintiff and the Palmdale redevelopment agency entered into pledge agreement No. A-3452. The second pledge agreement assigned and transferred to plaintiff real property owned and funds controlled by the Palmdale redevelopment agency. The second pledge agreement allowed the real property and funds to serve as collateral for the Palmdale redevelopment agency's obligations under the cooperation, option and purchase agreements.

According to the complaint, an important part of the redevelopment plan is construction and other related development activities in an ongoing project called the "Transit Village." Three development agreements, all dated January 11, 2012, have been entered into by plaintiff's housing authority with developers. The Transit Village project is the first step in development designed to provide affordable and market rate housing specific to the needs of commuting workforce households. One aspect of the Transit Village project is the continued development of the transportation center. The purpose of the transportation center is to provide integration between Metrolink and Antelope Valley Transit Authority services. The transportation center is one of the projects listed in exhibits attached to the cooperation agreements. Eventually, the Transit Village will surround the transportation center.

At present, the transportation center provides 650 commuter surface parking spaces for train and bus services. With the continuing redevelopment of the Transit Village, the parking lot will be diverted for other uses. Plaintiff plans to provide 200 replacement parking spaces in a parking structure north of the bus transfer point. In addition, the parking structure will be available for residents living within the Transit Village. The parking project is listed in the cooperation agreements. On January 31, 2012, plaintiff, not the Palmdale redevelopment agency, entered into the parking structure construction agreement with the developer to construct the parking structure for $6 million. It is the parking agreement, which will allow construction of the parking structure, that plaintiff seeks to have validated. Effective February 1, 2012, the date after

5

the parking structure construction agreement was entered into between plaintiff and the developer, the Palmdale redevelopment agency ceased to exist.

As is typical, redevelopment projects are financed through bonds, loans and other forms of indebtedness and tax increment funding. The Palmdale redevelopment agency relied on funds resulting from the sale of ten series of bonds and four loans for projects. All four loans were made by plaintiff's housing authority to the Palmdale redevelopment agency. Development of the transportation center, including the parking structure, was to be financed through the public indebtedness incurred as a result of the aforementioned bond issuance and indebtedness. The tax increment generated by the parking project will be used to repay the public indebtedness used for construction of the Transit Village and transportation center. Plaintiff intends to use those funds, resulting from bonds issued or indebtedness incurred by the Palmdale redevelopment agency, to pay the $6 million due under the parking agreement.

Finally, the complaint alleges that tax increment funding may now only be used to pay the indebtedness incurred by the Palmdale redevelopment agency. According to the complaint: "Up until January 31, 2012, redevelopment agencies including the [Palmdale redevelopment agency], received the tax increment funds generated from redevelopment areas to finance redevelopment activities. With the adoption of [Assembly Bill No. 26] and commencing on February 1, 2012, such funds are now available solely to repay indebtedness of redevelopment agencies." The complaint alleges $6 million in funding is to be paid by plaintiff from current and future tax increment funds to be received under the cooperation agreements.

The complaint alleges the following is the relationship between indebtedness, projects started by the Palmdale redevelopment agency and tax increments: "In order to finance the [p]arking [p]roject . . . and all other redevelopment projects. . . . [Plaintiff] and [the Palmdale redevelopment agency] have either issued bonds or accepted loans or other forms of public indebtedness. These bonds, loans and other forms of public indebtedness are to be repaid with tax increment funds generated from redevelopment activities in the [p]roject [a]reas, including funds that will be produced by the

6

construction of the [p]arking [structure] under the terms of the [p]arking [a]greement and its subsequent use and operation in conjunction with the Transit Village and the [t]ransportation [c]enter. The [p]arking [a]greement is therefore inextricably bound to the public indebtedness incurred to fund development activities related to the Transit Village, the [t]ransportation [c]enter and the [c]ity [p]rojects. The [p]arking [a]greement is therefore subject to validation under Code of Civil Procedure section 860 and Government Code section 53511[, subdivision ](a)."

## III. THE JUDICIAL NOTICE REQUEST AND PERTINENT LEGAL PRINCIPLES RESULTING FROM THE DISSOLUTION OF THE PALMDALE REDEVELOPMENT AGENCY

In conjunction with the demurrers, the finance department and the controller filed a judicial notice request. At this point, an understanding of the legal background of the changes in funding redevelopment projects warrants discussion so the nature of the parties' dispute is more understandable. The prior role of tax increments in redevelopment funding was explained by our Supreme Court: "Redevelopment agencies generally cannot levy taxes. [Citations.].) Instead, they rely on tax increment financing, a funding method authorized by article XVI, section 16 of the state Constitution and section 33670 of the Health and Safety Code. [Citations.] Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the redevelopment agency for repayment of debt incurred to finance the project. (Cal. Const., art. XVI, § 16, subds. (a), (b); § 33670, subds. (a), (b) . . . .) In essence, property tax revenues for entities other than the redevelopment agency are frozen, while revenue from any increase in value is awarded to the redevelopment agency on the theory that the

7

increase is the result of redevelopment.  [Citation.]" (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 246-247 (*Matosantos*); see *Huntington Park Redevelopment Agency v. Martin* (1985) 38 Cal.3d 100, 106.)  The foregoing discussion concerning tax increment funding for redevelopment agencies has changed as we will explain.

With the adoption of Assembly Bill Nos. 26 (Assembly Bill No. 1X 26) and 27 (2011-2012 1st Ex. Sess.), redevelopment agencies, with exceptions not pertinent to our case, were abolished.  (*Matosantos*, *supra*, 53 Cal.4th at pp. 250-251; *City of Palmdale v. City of Lancaster* (2014) 223 Cal.App.4th 978, 981, fn. 2.)  Our Supreme Court explained that Assembly Bill No. 1X 26 accomplished two tasks as new parts 1.8 and 1.85 of division 24 of the Health and Safety Code.  Part 1.8 restricted redevelopment agencies from:  issuing new bonds or incurring other indebtedness; adopting new plans or changes to existing plans; and entering into new partnerships.  (*Matosantos*, *supra*, 53 Cal.4th at p. 250; §§ 34162-34165.)  Part 1.8 also:  barred cities and counties from creating any new redevelopment agencies (§ 34166); provided that until successor agencies take over, existing obligations were unaffected; and permitted redevelopment agencies to continue making payments and performing existing obligations until successor agencies take over. (§ 34169; see *Matosantos*, *supra*, 53 Cal.4th at p. 250.)

The second part of Assembly Bill No. 1X 26 abolished, with exceptions not relevant to this case, redevelopment agencies.  (*Matosantos*, *supra*, 53 Cal.4th at pp. 250-251; see *City of Palmdale v. City of Lancaster*, *supra,* 223 Cal.App.4th at p. 981, fn. 2.)  Our Supreme Court has provided an overview of what part 1.85 was to accomplish:  "Part 1.85 (§§ 34170 to 34191) is the dissolution component [of Assembly Bill No. 1X 26].  It dissolves all redevelopment agencies (§ 34172) and transfers control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the redevelopment agency (§§ 34171, subd. (j), 34173, 34175, subd. (b)).  Part 1.85 requires successor agencies to continue to make payments and perform existing obligations.  (§ 34177.)  However, unencumbered balances of redevelopment agency funds must be remitted to the county auditor-controller for distribution to cities, the

8

county, special districts, and school districts in proportion to what each agency would have received absent the redevelopment agencies.  (See §§ 34177, subd. (d), 34183, subd. (a)(4), 34188.)  Proceeds from redevelopment agency asset sales likewise must go to the county auditor-controller for similar distribution.  (§ 34177, subd. (e).)  Finally, tax increment revenues that would have gone to redevelopment agencies must be deposited in a local trust fund each county is required to create and administer.  (§§ 34170.5, subd. (b), 34182, subd. (c)(1).)  All amounts necessary to satisfy administrative costs, pass-through payments, and enforceable obligations will be allocated for those purposes, while any excess will be deemed property tax revenue and distributed in the same fashion as balances and assets.  (§§ 34172, subd. (d), 34183, subd. (a).)"  (*Matosantos*, *supra*, 53 Cal.4th at p. 251.)

As a successor agency, plaintiff was required to submit a Recognized Obligation Payment Schedule for each six-month fiscal period.  (§ 34177, subds. (a), (l)(1).)  The initial schedule is referred to as an Enforceable Obligation Payment Schedule because it was contemplated it would be prepared by the redevelopment agency.  (§ 34169, subds. (a), (g)(1).)  The initial Enforceable Obligation Payment Schedule was served on the finance department, controller and county auditor-controller.  (§ 34169, subd. (g)(2).)  And the Enforceable Obligation Payment Schedule was ineffective unless approved by the finance department.  (§ 34169, subd. (i).)

The Recognized Obligation Payment Schedule submitted by the successor agency is a forward looking document for the next six-month period.  (§ 34177, subd. (l)(3).)  The Recognized Obligation Payment Schedule is a list of the enforceable obligations of the former redevelopment agency.  (§ 34177, subd. (l)(2)(A).)  The Recognized Obligation Payment Schedule is submitted for approval to an oversight board.  (§ 34177, subd. (l)(2)(B).)  The oversight board consists of seven members appointed by different persons and entities.  (§ 34179, subds. (a)-(g).)  In addition, the Recognized Obligation

9

Payment Schedule is submitted to the county auditor-controller, in this case Ms. Watanabe, the finance department and the controller. (§ 34177, subd. (l)(2)(C).[2])

<hr />

[2] Section 34177 states in part: "Successor agencies are required to do all of the following: [¶] . . . [¶] (l)(1) Before each six-month fiscal period, prepare a Recognized Obligation Payment Schedule in accordance with the requirements of this paragraph. For each recognized obligation, the Recognized Obligation Payment Schedule shall identify one or more of the following sources of payment: [¶] (A) Low and Moderate Income Housing Fund. [¶] (B) Bond proceeds. [¶] (C) Reserve balances. [¶] (D) Administrative cost allowance. [¶] (E) The Redevelopment Property Tax Trust Fund, but only to the extent no other funding source is available or when payment from property tax revenues is required by an enforceable obligation or by the provisions of this part. [¶] (F) Other revenue sources, including rents, concessions, asset sale proceeds, interest earnings, and any other revenues derived from the former redevelopment agency, as approved by the oversight board in accordance with this part. [¶] (2) A Recognized Obligation Payment Schedule shall not be deemed valid unless all of the following conditions have been met: [¶] (A) A Recognized Obligation Payment Schedule is prepared by the successor agency for the enforceable obligations of the former redevelopment agency. The initial schedule shall project the dates and amounts of scheduled payments for each enforceable obligation for the remainder of the time period during which the redevelopment agency would have been authorized to obligate property tax increment had the a [*sic*] redevelopment agency not been dissolved. [¶] (B) The Recognized Obligation Payment Schedule is submitted to and duly approved by the oversight board. The successor agency shall submit a copy of the Recognized Obligation Payment Schedule to the county administrative officer, the county auditor-controller, and the Department of Finance at the same time that the successor agency submits the Recognized Obligation Payment Schedule to the oversight board for approval. [¶] (C) A copy of the approved Recognized Obligation Payment Schedule is submitted to the county auditor-controller, the Controller's office, and the Department of Finance, and is posted on the successor agency's Internet Web site. [¶] (3) The Recognized Obligation Payment Schedule shall be forward looking to the next six months. The first Recognized Obligation Payment Schedule shall be submitted to the Controller's office and the Department of Finance by April 15, 2012, for the period of January 1, 2012, to June 30, 2012, inclusive. This Recognized Obligation Payment Schedule shall include all payments made by the former redevelopment agency between January 1, 2012, through January 31, 2012, and shall include all payments proposed to be made by the successor agency from February 1, 2012, through June 30, 2012. Former redevelopment agency enforceable obligation payments due, and reasonable or necessary administrative costs due or incurred, prior to January 1, 2012, shall be made from property tax revenues received in the spring of 2011 property tax distribution, and from other revenues and balances transferred to the successor agency."

10

The finance department may review an oversight board's actions. (§ 34179, subd. (h).) The finance department can compel a successor agency to produce documents relating to enforceable obligations. (§ 34177, subd. (a)(2).) And both the department and the controller have standing to file suit to prevent a violation of any portion of part 1.85. (§ 34177, subd. (a)(2).) A successor agency has the opportunity to meet and confer with the finance department concerning disputes concerning a Recognized Obligation Payment Schedule issue. (§ 34177, subd. (m).) And an oversight board's actions shall not be effective until approved by the finance department. (§ 34179, subd. (h).) After, review, the department may eliminate or modify any item on a Recognized Obligation Payment Schedule. (§ 34179, subd. (h).[3]) Further, the county-auditor controller is required to audit the redevelopment agencies' assets and liabilities. The audits were to be completed by October 1, 2012. (§ 34182, subds. (a)(1)-(2).) Further, the county auditor-controller pays successor agency obligations from the Redevelopment Property Tax Trust Fund. (§ 34182, subds. (c)(1)-(2).)

With this background in mind, we turn to the judicial notice documents. The parties do not dispute these documents were properly judicially noticed. The initial Enforceable Obligation Payment Schedule covers January through June 2012. Plaintiff's second Recognized Obligation Payment Schedule covers July through December 2012. The finance department disapproved of several line items in both schedules. On April 27, 2012, the finance department stated the items listed in the two schedules as Cooperation Agreement and Consulting Services which totaled $1.196 billion were unenforceable obligations. The finance department explained: "A Cooperation Agreement or portions of a Cooperation Agreement are only enforceable to the extent third party contracts existed prior to June 28, 2011. . . . [Section] 34163(b) prohibits a redevelopment agency from entering into a contract with any entity after June 27, 2011. It is our understanding

---

[3]     Section 34179, subdivision (h) states in part: "If the department reviews a Recognized Obligation Payment Schedule, the department may eliminate or modify any item on that schedule prior to its approval. The county auditor-controller shall reflect the actions of the department in determining the amount of property tax revenues to allocate to the successor agency."

11

that no third party contracts were entered into prior to June 28, 2011." The two Recognized Obligation Payment Schedules were returned to plaintiff for reconsideration. Further, the April 20, 2011 letter stated that Recognized Obligation Payment Schedules were ineffective until approved by the finance department. On April 27, 2011, the finance department reiterated its view that the cooperation agreement was unenforceable. The parties agree that the effect of the department's letters was to deny approval of the Recognized Obligation Payment Schedules in its entirety which includes funding the parking agreement.

## IV. THE DEMURRERS, VENUE CHANGE MOTION, DEMURRER OPPOSITION AND REPLY

The finance department and controller demurred to the complaint. One of the grounds for their demurrer was that the proper venue for resolving the parties' dispute was Sacramento County Superior Court as required by section 34168, subdivision (a). In the alternative, they moved to transfer the present lawsuit to Sacramento County Superior Court pursuant to Code of Civil Procedure section 397 and section 34168. The consolidated demurrer and venue change points and authorities argue that: payments of redevelopment obligations must be approved by the finance department; the finance department had denied plaintiff's request to issue payments under the cooperation agreement; a validation complaint could not be used to circumvent the requirements of Assembly Bill No. 1X 26; and suit should have been filed in Sacramento County Superior Court. The reply of the finance department and controller argued contracts and obligations of dissolved redevelopment agencies may not be authorized via a validation action. In addition, their reply argued that if the matter was not resolved by a demurrer, the action should be transferred to Sacramento County Superior Court.

## V.  HEARING AND DISMISSAL

At the hearing on the demurrer, the trial court ruled in connection with the venue change motion of the finance department and controller:  "I think this case really is probably better suited in Sacramento, but it was brought to me.  I need to make a decision."  The trial court then orally sustained the demurrers without leave to amend and ordered the case dismissed.

The dismissal order was filed August 22, 2012.  The dismissal order states:  the complaint fails to allege facts sufficient to establish the parking agreement's validity; plaintiff's arguments were legal, not factual; plaintiff's counsel acknowledged there were no additional facts to plead; the demurrers of the finance department, the controller and the auditor-controller were sustained without leave to amend; the venue change motion of the state finance department and controller was thereby moot; and the complaint was dismissed with prejudice.

## VI.  THE DEMURRER WAS PROPERLY SUSTAINED WITHOUT LEAVE TO AMEND

We apply the following standard of review to a demurrer dismissal:  "On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled.  We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  [Citation.]  Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions, or conclusions of law.  [Citations.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]"  (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865; see *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300-301.)  Further, as did the trial court, we may rely upon judicially noticeable matters.  (Code Civ. Proc., §

13

430.30, subdivision (a); *StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 457, fn. 9.)

There are multiple reasons why the demurrer was properly sustained without leave to amend. We need address only three. First, section 34161 states: "Notwithstanding Part 1 (commencing with Section 33000), Part 1.5 (commencing with Section 34000), Part 1.6 (commencing with Section 34050), and Part 1.7 (commencing with Section 34100), or any other law, commencing on the effective date of this part, no agency shall incur new or expand existing monetary or legal obligations except as provided in this part. All of the provisions of this part shall take effect and be operative on the effective date of the act adding this part." Assembly Bill No. 1X 26 was signed by the Governor on June 28, 2011, and chaptered by the Secretary of State on June 29, 2011. (Legis. Counsel's Dig., Assem. Bill No. 26 (2011-2012 1st Ex. Sess.).) The parking agreement was entered into effective January 11, 2012. The developer signed the parking agreement on January 30, 2012. Plaintiff's city manager and clerk executed the parking agreement on January 31, 2012. The funding for the parking agreement was to come from tax increment funds received by plaintiff in the *current and forthcoming* fiscal years. The department expressly refused to approve the proposed use of tax increment revenues because the parking agreement was entered into after June 27, 2011. Thus, the parking agreement is unenforceable pursuant to section 34161.

Second, the contemplated funding for the parking agreement is not an enforceable obligation pursuant to section 34171, subdivision (d)(2). Section 34171, subdivisions (d)(1)(A) through (G) identify as enforceable obligations: bonds; loans; federally mandated payments; judgments or settlements; "legally binding and enforceable" agreements; contracts necessary for the continued operation of the redevelopment agency; and deferred sums borrowed from a redevelopment agency's low and moderate income housing funds. The parking agreement does not fall within any of the foregoing categories.

Therefore, the parking agreement is unenforceable pursuant to section 34171, subdivision (d)(2) which states, "For purposes of this part, 'enforceable obligation' does

14

not include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency." The parking agreement at issue falls squarely within the language of section 34171 subdivision (d)(2). And the parking agreement does not fall within the two exceptions to the immediately foregoing language in section 34171 subdivision (d)(2). The two exceptions to the unenforceability provision in section 34171 subdivision (d)(2) are as follows: "However, written agreements entered into (A) at the time of issuance, but in no event later than December 31, 2010, of indebtedness obligations, and (B) solely for the purpose of securing or repaying those indebtedness obligations may be deemed enforceable obligations for purposes of this part. Notwithstanding this paragraph, loan agreements entered into between the redevelopment agency and the city, county, or city and county that created it, within two years of the date of creation of the redevelopment agency, may be deemed to be enforceable obligations." The parking agreement was not entered into at the time of the issuance of an indebtedness obligation as that term is defined in section 34171, subdivision (e). The term "indebtedness obligations" for purposes of section 34171, subdivision (e) is defined in section 34171, subdivision (e).[4] An indebtedness obligation within the meaning of section 34171, subdivision (d)(2) must involve evidence of debt delivered to "third-party investors or bondholders" to provide financing for redevelopment projects. The parking agreement does not involve this type of contract with such investors or bondholders. Thus, pursuant to section 34171, subdivision (d)(2), the parking agreement, which would create a drain on current and future tax increment revenues, is not an enforceable obligation.

　　Third, there is no merit to plaintiff's contention the parking agreement is valid pursuant to section 34167.5. Plaintiff relies upon the following language in section

---

[4] Section 34171, subdivision (e) states, "'Indebtedness obligations' means bonds, notes, certificates of participation, or other evidence of indebtedness, issued or delivered by the redevelopment agency, or by a joint exercise of powers authority created by the redevelopment agency, to third-party investors or bondholders to finance or refinance redevelopment projects undertaken by the redevelopment agency in compliance with the Community Redevelopment Law (Part 1 (commencing with Section 33000))."

15

34167.5: "If such an asset transfer did occur during that period [after January 1, 2011,] and the government agency that received the assets is not contractually committed to a third party for the expenditure or encumbrance of those assets, to the extent not prohibited by state and federal law, the Controller shall order the available assets to be returned to the redevelopment agency or, on or after October 1, 2011, to the successor agency, if a successor agency is established pursuant to Part 1.85 (commencing with Section 34170). Upon receiving that order from the Controller, an affected local agency shall, as soon as practicable, reverse the transfer and return the applicable assets to the redevelopment agency or, on or after October 1, 2011, to the successor agency, if a successor agency is established pursuant to Part 1.85 (commencing with Section 34170)." In our view, there is an ambiguity in section 34167.5 and the remainder of Assembly Bill No. 1X 26. In the case of an asset transfer, section 34167.5 allows for the return of funding to a successor agency upon the controller's order. Yet, section 34161 bars an agency from incurring or increasing existing monetary or legal obligations after June 28, 2011. Further, as indicated, section 34171, subdivision (d)(2) renders the parking agreement an unenforceable obligation.

In the face of such lack of clarity, it is appropriate to review the purpose of Assembly Bill No. 1X 26: "'"If the statute's text evinces an unmistakable plain meaning, we need go no further.'" [Citation.] But where, as here, a statute's terms are unclear or ambiguous, 'we may "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.'" (*In re M.M.* (2012) 54 Cal.4th 530, 536.)" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 803.)

The purpose of Assembly Bill No. 1X 26 is expressly set forth in section 34167, subdivision (a): "This part is intended to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services including police and fire protection services and schools. It is

16

the intent of the Legislature that redevelopment agencies take no actions that would further deplete the corpus of the agencies' funds regardless of their original source. All provisions of this part shall be construed as broadly as possible to support this intent and to restrict the expenditure of funds to the fullest extent possible." Given this express purpose, we conclude the "asset transfer" language in section 34167.5 does not refer to a contract such as the parking agreement. (*Lake v. Reed* (1997) 16 Cal.4th 448, 464 ["a more specific statute controls over a more general one"]; *Prudential Reinsurance Co. v. Superior Court* (1992) 3 Cal.4th 1118, 1148 ["This violates the fundamental principle that where there is a conflict the more specific statute controls over the more general."].) The more specific provisions of Assembly Bill No. 1X 26, sections 34161 and 34171, subdivision (d)(2) taken together establish that the parking agreement is unenforceable. And, the effect of our conclusion is to further conserve public moneys to be available for fire and police protection which is consistent with the purposes stated in section 34167, subdivision (a). Plaintiff's arguments based upon section 34167.5 are without merit. We need not address the parties other contentions concerning Assembly Bill No. 1X 26 and the propriety of a validation action.

## VII.  THE FACT THE VENUE CHANGE MOTION SHOULD HAVE BEEN GRANTED DOES NOT PERMIT REVERSAL

As noted, the finance department and controller moved to change venue to Sacramento County Superior Court. The venue change motion was premised on section 34168, subdivision (a) which states, "Notwithstanding any other law, any action contesting the validity of this part or Part 1.85 (commencing with Section 34170) or challenging acts taken pursuant to these parts shall be brought in the Superior Court of the County of Sacramento." Code of Civil Procedure section 397, subdivision (a) provides that a venue change motion may be filed when an action is commenced in the wrong court.

17

The gravamen of the present action is a challenge to actions taken pursuant to part 1.85, sections 34170 through 34191.5. The judicially noticeable documents establish that the finance department disapproved of those portions of the cooperation agreements which fund the parking agreement. Section 34179, subdivision (h) permits the department to eliminate or modify any item on a Recognized Obligation Payment Schedule. In the trial court, the finance department, the controller and the auditor-controller took the position that part 1.85 prevented inclusion of the parking agreement in the two payment schedules. And they argued property tax revenues could not be used to finance the parking agreement. By contrast, plaintiff argued that part 1.85 had nothing to do with inclusion of the parking agreement in the two payment schedules. And plaintiff argued that property tax revenues could properly be used to construct the parking structure.

The present dispute involves a "challeng[e to] acts taken pursuant to" part 1.85 within the meaning of section 34168, subdivision (a). Thus, by the express terms of section 34168, subdivision (a), the trial court was obligated to transfer the action to Sacramento County Superior Court. However, the erroneous venue change motion ruling does not permit the orders under review to be reversed.

The refusal to grant the finance department's and controller's venue change motion is not a jurisdictional error. (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 121 ["Although the language of [Code of Civil Procedure section 396a] is mandatory, the present action is not one in which the Constitution makes venue jurisdictional, nor is [Code of Civil Procedure] section 396a a statute which specifies a particular place of trial as part of the grant of subject matter jurisdiction."]; *Newman v. County of Sonoma* (1961) 56 Cal.2d 625, 627 ["[Code of Civil Procedure] section 394 is not jurisdictional in the fundamental sense."]; *Herd v. Tuohy* (1901) 133 Cal. 55, 59 ["[T]here are statutory provisions determining the proper place of trial (Code Civ. Proc., [§§] 392-395); but these do not affect the jurisdiction of the court. . . ."].) The failure to grant the venue change motion is therefore subject to harmless error analysis under California Constitution, article VI, section 13. (*Rutherford v. Owens-Illinois, Inc.* (1997)

18

16 Cal.4th 953, 983; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570; *In re Marriage of Stephen P.* (2013) 213 Cal.App.4th 983, 995; see Eisenberg, et al, California Practice Guide:  Civil Appeals and Writs (2014) ¶ 15:96.5, p. 15-51 ["[A]n order . . . denying a motion for change of venue  . . .  is also reviewable on appeal from the final judgment . . . .  Even so, on such appeal, it is difficult to conceive of a successful showing of prejudice ensuing from trial in the wrong court."].)  Here, plaintiff has not asserted there is a reasonable probability of a different result had the case been sent to Sacramento County Superior Court.  The demurrers would have been sustained without leave to amend.  We need not address the other grounds for concluding the trial court's ruling on the venue change motion is not a ground for reversal.

## VIII.  DISPOSITION

The orders sustaining the demurrers without leave to amend and dismissing the complaint are affirmed.  Defendants, the California Department of Finance, the State Controller, and Wendy Wantanabe, in her capacity as the Auditor-Controller of Los Angeles County, are to recover their costs incurred on appeal from plaintiff, City of Palmdale.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KRIEGLER, J.